**FILED**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

5:23 pm, 5/4/21

**Margaret Botkins
Clerk of Court**

| | |
|---|---|
| TERRI VAN DAM,<br><br>   Plaintiff,<br><br> vs.<br><br>TOWN OF GUERNSEY, WYOMING,<br>NICK PAUSTIAN, *in his official and<br>individual capacities*, KATE FARMER,<br>*in her official and individual capacities*,<br>KELLIE AUGUSTYN, *in his official and<br>individual capacities*,<br><br>   Defendant. | Case No.  20-CV-60-SWS |

## ORDER GRANTING IN PART, DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

   This matter comes before the Court on Defendants' *Motion for Summary Judgment*

(ECF Nos. 36, 37) and Plaintiff's *Response in Opposition*. (ECF No. 41.) The Court also

held a hearing on the matter on April 27, 2021. After considering the parties' arguments

and having reviewed the record, the Court finds the Defendants' motion should be granted

in part and denied in part.

### FACTUAL BACKGROUND[1]

---

[1] The Court's factual background is taken from the materials submitted by the parties and viewed in the light most favorable to the nonmoving party, Plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 655-57 (2014).

Plaintiff, Terri Van Dam ("Van Dam") was terminated from her position as the town of Guernsey's Chief of Police on January 15, 2020. Plaintiff claims she was terminated in retaliation for exercising her free speech rights and in violation of her due process property and liberty rights. Van Dam assert these claims against Defendants, the Town of Guernsey, Wyoming ("the Town"), Nick Paustian, the Town Mayor, Kellie Augustyn, a Town Councilman, and Kate Farmer, Clerk and Treasurer for the Town, in both their official and individual capacities. (*See* ECF No. 1 at 2.)

Van Dam began her employment as an officer with the Guernsey Police Department ("GPD") in 2015. (ECF No. 37-2 at 3.) Over time, she was promoted to sergeant and ultimately appointed chief of police in January of 2019, prior to her termination in January 2020. (*See* ECF No. 42 at 2; ECF 37-2 at 17-18.) At the time of her initial employment as a police officer in 2015 Van Dam was provided with and acknowledged receiving a copy of the Guernsey Policy and Procedure Manual (ECF No. 37-1) dated July 7, 2015. (ECF No. 37-2 at 25-26, 31). She also received and signed an At-Will Employment Statement. (ECF No. 37-2 at 26-27; 32). Effective July 1, 2015, the Policy and Procedure Manual states that it replaces all previous manuals and supersedes all earlier oral and written materials about Town policies and procedures. (ECF No. 37-1 at 4). In addition, it expressly states that "it is not to be construed by any employee as containing binding terms and conditions of employment. The Town of Guernsey is an at-will employer. The Town of Guernsey retains the right to change the contents of this document, as it deems necessary." (*Id*. at 4 and 18.) In her affidavit Ms. Van Dam asserts that when hired she was provided "a Guernsey Police Department Standard Operating Guidelines (GPD Handbook)

and made aware that it would control my employment with the GPD." (ECF No. 44-2 at 1). She did not attach this GPD Handbook to her affidavit. However, Plaintiff did attach portions of a document entitled Guernsey Police Department Standard Operating Guidelines. (ECF No. 44-11). These Guidelines indicate an effective date December 1, 2012 (ECF No. 44-11 at 2) but miscellaneous "effective" "reviewed" and "revised" dates throughout the selected pages of the Guidelines. (ECF 44-11 at 4, 5, 7 and 11). There is no evidence to indicate the Mayor or Town Council approved or adopted the Guidelines, or what version existed at what time.

Over the course of her employment as a police officer and ultimately as Chief of Police Van Dam expressed concerns to the Mayor, Town Council and the Town Attorney about what she believed to be illegal conduct by Guernsey residents, some involving employees that worked for the Town. (ECF No. 44-2 at 2). Despite her investigation and concerns Van Dam asserts these cases were not being pursued by the Platte County Attorney. (*Id*.) Van Dam alleges upon receiving no support in pursuing the cases she had investigated, she broke the chain of command and contacted the Wyoming Attorney General's office to complain about the Platte County Attorney's failure to prosecute her cases. (*Id*.) She also contacted the Wyoming Division of Criminal Investigation ("DCI") to request assistance, outside the normal course of her duties. (*Id*.) To this end, in August of 2019, Van Dam met with Forrest Williams from DCI to provide him with case files and evidence. (*Id*.) She also followed up with email correspondence to DCI detailing her suspicions. (ECF No. 37-4). Van Dam also met with the FBI in November of 2019 to discuss her suspicions. (ECF No. 44-2 at 3). In addition to her meetings with the FBI and

DCI, Van Dam met with Karina Lewis, who had expressed concerns about illegal activity in the Town of Guernsey. (*Id.*)  Van Dam had been introduced to Ms. Lewis by Misty Clevenger, a sergeant on the Guernsey Police Department, hired by Van Dam. In early January 2020, after discussion with Ms. Clevenger and Ms. Van Dam, Ms. Lewis posted a statement on Facebook detailing concerns about the Guernsey Town Council's lack of support for the Guernsey Police Department and a January 7, 2020 meeting at which "It is understood the town council will be voting to disband the police department." (ECF No. 44-4). Lewis' social media post also stated that "The institution town of Guernsey, Mayor, and town council are now under investigation from an outside government agency." (*Id.*)

On January 14, 2020, the Town met in executive session to discuss Plaintiff's termination.  Based upon the minutes Mayor Paustian asserted the reasons for termination were "noncompliance, personnel control, derogation of duties, insubordination." (ECF No. 45 at 1).  Part of the discussion also concerned the Facebook post problems and that there was "some leakage coming out of this town and he [Mayor Paustian] doesn't know where its coming from.  The stuff that came out in the post said that the chief had gone to the council and mayor about the issues." (*Id.* at 1.) The executive minutes also noted that Mayor Paustian had called and spoken with DCI who purported advised him to "let her go, she is a liability to your community." (*Id.* at 2.) Forrest Williams, with the DCI, testified that he spoke with Mayor Paustian at some point[2] and the Mayor advised Mr. Williams that the Town Council were in the process of changing out the Chief of Police. (ECF No. 44-3

---

[2] The timing of this conversation is unclear, however, based upon the content of the Executive Minutes (ECF No. 45) and Mayor Paustian's deposition testimony (ECF No. 44-7 at 10-11), it is reasonable to infer this conversation predated the January 14, 2020 Executive Session meeting.

at 5). Based upon information allegedly provided from Ms. Van Dam, Mayor Paustian told Mr. Williams that he was aware of active DCI investigations and wanted to let Williams know that he was hopeful a change in the Chief of Police would not interfere with those investigations. (*Id*.) Mr. Williams also testified that he was told by Mayor Paustian that Chief Van Dam "did not play well with other law enforcement agencies, did not get along with the county attorney." (*Id*. at 6.) In response Mr. Williams told Mayor Paustian "that based upon his limited interaction with Terri Van Dam, I understood his concerns." (*Id*.) However, Mr. Williams denied saying that Ms. Van Dam was a liability to the Town or that he should let her go. (*Id*. at 8.)

The parties attribute different reasons for Van Dam's termination. The Town cites to Van Dam's failure to operate the police department within its budget constraints (ECF No. 37 at 6-7). Van Dam asserts her termination was in retaliation for her investigating and reporting potential criminal activity involving Town Council members to outside agencies. (*Id*. at 7-8.) Defendants categorized Van Dam's investigation as "nothing more than small town rumors," and deny that her termination had anything to do with her passing the rumors along to outside agencies. (ECF No. 37 at 3-4.)

Van Dam accuses Defendants of monitoring her emails prior to her termination, learning about her investigation and external reporting, and terminating her because of it. (ECF No. 42 at 9-10.) The Defendants assert they did not learn about her emails to outside agencies until after her termination. (*See* ECF No. 37 at 6-7). It is undisputed that Defendant and Town Clerk and Treasure, Ms. Farmer as email administrator for the Town had set up and had access to Town employee email accounts and their passwords. (ECF

No. 44-13 at 4-6). Defendants acknowledge that they accessed and search Van Dam's email account concerning any contact between Van Dam and Carina Lewis, but not until 2:15 to 2:30 p.m., after Van Dam had been terminated. (*Id*. at 4.)  In addition, access was given to Defendant and Town Councilman Augustyn, purportedly after Ms. Van Dam's termination. (*Id*. at 6.) At this point, based in part upon the Minutes from the January 14, 2020 executive session (ECF No. 45) and the testimony of Mayor Paustian (ECF No. 44-7 at 12-13), it is a reasonable inference that access was made to Van Dam's email account prior to her January 15, 2020 termination.

Regardless, Defendants argue Van Dam is not protected by the First Amendment right to free speech since her "investigation" and external reporting to DCI and the FBI was done in the scope of her job. (*Id*. at 10-11.) This, Defendants argue, precludes recovery by Van Dam on her First Amendment claim because it is barred by the doctrine of qualified immunity. (*Id*. at 11-15.) As to Van Dam's procedural due process claims, the Defendants assert Van Dam has no cognizable liberty or property interest with which the state has interfered—highlighting Van Dam's at-will employment status and her failure to show a deprivation of her liberty interest. (*Id*. at 15-20.)

In addition to the dispute over the motivating factor(s) for Van Dam's termination, the parties disagree as to Van Dam's employment status. The Defendants argue she was an at-will employee pursuant to the Town's policy and procedure manual and at-will acknowledgment. (*Id*. at 8; *see also* ECF No. 37-1.) Relying upon the GPD Guidelines, Van Dam asserts she was not at-will, rather, after a probationary period, the Town intended for police officers to be for-cause employees, despite what the Town's policy manual

stated. (ECF No. 42 at 13; ECF No. 44-2 at 2). This, Van Dam asserts, created an implied employment contract under which she could only be terminated for cause. (*Id*. at 13-17.)

Van Dam's Complaint against the Defendants asserts six claims for relief: (1) a claim for retaliatory termination in violation of her First Amendment right to free speech; (2) a violation of procedural due process resulting in the deprivation of her property interest in continued employment; (3) a violation of her due process liberty interest in continued employment as a law enforcement officer; and (4) a "private action" claim pursuant to 18 U.S.C. § 1983. (*See* ECF No. 1 at 6-13.) Plaintiff asserts separate claims for injunctive relief and a declaratory judgment, ultimately requesting reinstatement of her position of chief of police, in addition to monetary damages in the form of lost wages and benefits. (*Id*. at 13-15.)

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). Testimony or other evidence "grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004). In considering the motion, the Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party

opposing summary judgment. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust*, 744 F.3d 623, 628 (10th Cir. 2014). Generally, the moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc*., 318 F.3d 976, 979 (10th Cir. 2003)).

Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating there is a genuine issue for trial. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to avoid a properly supported summary judgment motion; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In determining whether a genuine issue of material fact exists the Court may only consider evidence that would ultimately be admissible at trial and disregard inadmissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3D 1202, 1207-08 (10th Cir. 2010); *see also Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

Individual defendants named in a § 1983 action may raise the defense of qualified immunity. When an individual defendant asserts qualified immunity at the summary judgment stage, the plaintiff must show defendant's lack of entitlement. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). To do so, a plaintiff must show: (1) the defendant's actions violated a federal constitutional or statutory right, and (2) that right

was clearly established at the time of the unlawful conduct. *Knopf v. Williams*, 884 F.3d 939, 943-44 (10th Cir. 2018); *see also Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006). This test evinces a "fair warning" standard: if officials violate clearly established federal law, liability may result. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). It is with these standards and burdens in mind the Court evaluates Defendants' Motion.

DISCUSSION

**Proper Defendants and their Capacity**

Beginning with Van Dam's municipal liability claim against the Town, under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), a municipality or local governmental agency may only be liable under 42 U.S.C. § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting 42 U.S.C. § 1983). A local governmental body can only be liable under § 1983 for its own "illegal acts," *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); it "may not be sued under § 1983 for an injury inflicted solely by its employees or agents" *Monell*, 436 U.S. at 694. "[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691.

"Instead, 'the government as an entity' may only be held liable 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell*, 436 U.S. at 694). "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that

'action pursuant to official municipal policy' caused their injury." *Connick*, 563 U.S. at 60-61 (quoting *Monell*, 436 U.S. at 691). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61. "[I]n enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694).

Van Dam lodges her various § 1983 claims against the Town as well as official capacity claims against Mayor Paustian, Councilman Augustyn and Town Clerk/Treasurer Kate Farmer. Based upon Wyoming Statutes it appears that the Mayor's termination of Van Dam may properly be attributable to the Town as Mayor Paustian was the final policy maker with respect to the termination of the police chief under Wyo. Stat. § 15-3-204:

> (a) Unless otherwise provided by ordinance, the clerk, treasurer, engineer, attorney, fire chief, **police chief**, municipal judges and department heads as specified by ordinance **shall be appointed by the mayor** with the consent of the governing body **and may be removed by the mayor**. All other appointments, except the appointment of members of a board or commission, and removals shall be made by the mayor without consent of the governing body unless consent is required by separate statute.

*Id.* (emphasis added); *see also McDonald v. Wise*, 769 F.3d 1202, 1215-16 (10th Cir. 2014) (under city charter mayor was final policy maker with respect to termination of city employees and therefore city liable if mayor deprived plaintiff of liberty interest). However, as Van Dam conceded during oral argument before the Court on April 27, 2021, suit against the named defendants in their "official capacities" in addition to suing the

Town of Guernsey, is unnecessarily redundant. *See Monell*, 436 U.S. at 658, 690 n. 55 (noting, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). Thus, the claims against Defendants Paustian, Farmer, and Augustyn in their *official* capacities are DISMISSED.

**Kate Farmer**

In asserting claims against Ms. Farmer in her individual capacity Plaintiff asserts "Farmer provided access to Plaintiff's emails so they could be reviewed by the Council and violated multiple statutes to hide the evidence of what occurred in executive sessions and what was contained in the Plaintiff's emails." (ECF No. 42 at 23). Plaintiff has failed to identify any Federal statutory or constitutional right that Farmer purportedly violated by this conduct. In addition, Plaintiff asserts some vague allegations regarding all three individual defendants providing interviews with some reporter about Plaintiff's termination. (*Id*. at 21.) There is no evidence provided as to the substance of any purported interview. As noted above, only the Mayor, with the consent of the town council, could hire and remove Plaintiff. Ms. Farmer was neither her supervisor nor employer.

Individual liability under § 1983 requires a defendant's personal involvement in the alleged constitutional violation. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767-68 (10th Cir. 2013). There is no such link between Van Dam's claims and Farmer's alleged conduct. In addition, Plaintiff must show that the defendant's alleged actions caused the constitutional violation. *Id*. (citing with approval *Dodds v. Richardson*, 614 F.3d 1185, 1200 (10th Cir. 2010)). A plaintiff must establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant

knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights. *Id*. at 1185; *see also Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). There is no causal link made in this case to Ms. Farmer. Finally, even if such a link existed, Plaintiff has failed to overcome Farmer's qualified immunity by showing that Farmer's conduct violated a constitutional right, and that right was clearly established at the time of Farmer's violation. *See Perry v. Durborow*, 892 F.3d 1116, 1121-1123 (10th Cir. 2018). Accordingly, Farmer is also entitled to Judgment in her favor on Plaintiff's individual claims against her.

**Qualified Immunity of Individual Defendants Paustian and Augustyn**

Turning to Van Dam's claims against Nick Paustian, and Kellie Augustyn in their *individual* capacities ("the Defendants"), these claims fit directly into two categories: (1) violation of First Amendment right to free speech, which implicates qualified immunity raised by Defendants, and (2) deprivation of liberty and property interests in violation of procedural due process. The Court will address each in turn.

1. **Plaintiff Satisfies the Two-Prong Test for Rebutting Defendants' Qualified Immunity Defense Against Plaintiff's First Amendment Retaliatory Termination Claim.**

Beginning with Van Dam's First Amendment claim, the parties do not dispute Van Dam's status as a public employee as chief of police for the Town of Guernsey. Instead, the parties dispute the reasoning for Van Dam's termination and the scope of actions Van Dam engaged in prior to her termination. Defendants argue Van Dam's conduct is not recognized as protected speech under the First Amendment because Van Dam's

investigation and reporting to the Wyoming Attorney General, DCI and the FBI were part of her duties as an officer. (*See* ECF No. 37 at 10-11.) Defendants declare qualified immunity as a defense, primarily arguing Van Dam cannot claim retaliation because her investigation and reporting were a part of her public duty and were not connected to her termination. (*Id*. at 13-14.) Defendants also argue Van Dam fails to allege a clearly established right under the second prong of the qualified immunity test. (*Id*. at 15.)

42 U.S.C. § 1983 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." Defendants named in a § 1983 action may raise qualified immunity as a defense, "which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (internal citations omitted). Once a defendant asserts qualified immunity as a defense, the plaintiff must show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). This burden is not a light one, and a plaintiff must satisfy both prongs of the inquiry or else the Court must grant qualified immunity in favor of the defendant. *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

        a. **Qualified Immunity Prong One: Plaintiff's complaint creates a genuine dispute as to the latter two elements under the *Garcetti/Pickering* test.**

Turning to the first inquiry, Van Dam must allege the Defendants' actions violated a federal constitutional right, here, a First Amendment protected speech right. When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," but "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 417 (2006). The government employer, however, also has a "countervailing interest in controlling the operation of its workplaces." *Lane v. Franks*, 573 U.S. 228, 234 (2014). Therefore, Courts must balance between interests of the employee, as a citizen who comments upon matters of public concern, and state interests, as an employer whose job it is to promote efficiency of performance of public service. *Pickering v. Bd. of Ed. Of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). To appropriately balance these interests, the First Amendment "prohibits public employers from taking adverse action against employees because of their protected speech." *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018). The Tenth Circuit utilizes the *Garcetti/Pickering* test to determine whether an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment. *See id*. The test consists of five elements:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as an employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*See Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)). "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury." *Id.* (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)).

Unsurprisingly, the parties disagree as to how the test applies to the facts of this case, primarily hinging their arguments on the first element. Defendants argue Van Dam's communication and emails to outside agencies were strictly within her duties as a law enforcement officer. (*See* ECF No. 37 at 14.) Defendants also broadly argue Van Dam's complaints to outside law enforcement agencies were simply rumors not amounting to anything substantive. (*Id.* at 10-13.) Van Dam disagrees with Defendants' categorization of her investigating and reporting, highlighting how her investigating activity was completed "on her own time, without authorization, unpaid using her own equipment and eventually breaking the chain of command to make reports to outside agencies[.]" (ECF No. 42 at 5.)

The Tenth Circuit has taken a broad view of the meaning of speech "that is pursuant to an employee's official duties." *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Knopf*, 884 F.3d at 945 (quoting *Lane*, 573 U.S. at 240). Courts take a practical view of facts and circumstances of the nature of the employment when analyzing the speech, not necessarily viewing an employee's job description as dispositive. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007).

"If the speech involves 'the type of activities that [the employee] was paid to do,' then it falls within the scope of an employee's duties." *Id.* (quoting *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 800-01 (10th Cir. 2007)). "Stated another way, if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Chavez-Rodriguez*, 596 F.3d at 713 (internal quotation marks omitted). The fact that an email "concerns information acquired by [Van Dam] by virtue of [her] public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240.

Applying this principle to Van Dam's alleged protected speech, the Court finds much of the analysis cuts in both directions. As an initial matter, the speech Van Dam asserts in her briefing is protected under her First Amendment rights includes emails and conversations to Wyoming's Attorney General's Office, DCI, and FBI agencies. (*See* ECF No. 42 at 5-6.) Van Dam reported what she suspected to be criminal activity to these agencies after trying unsuccessfully to garner further attention internally. (*See* ECF No. 44-2.) Generally, reporting suspected criminal conduct to law enforcement agencies is precisely "the type of activities [Van Dam] was paid to do" as chief of police. *See Brammer-Hoelter*, 492 F.3d at 1203. However, Van Dam stated in her sworn affidavit that she sent these emails to outside agencies only after being dissatisfied with the Defendants' response to her concerns. (*See* ECF No. 42-11 at 2.) She explains, "As I did not receive the support I had hoped for, I lost faith in my direct chain of command, but continued to

investigate what I considered criminal conduct on my own time, out of uniform and using my own vehicle and equipment." (*Id*.)

The Tenth Circuit has observed that when an employee directs speech at an individual or an entity outside of their chain of command, that conduct is often outside of an employee's official duties. *See, e.g., Rohrbough v. University of Colorado Hosp. Authority*, 596 F.3d 741, 747 (10th Cir. 2010). While not an absolute rule, the premise is consistent with the facts of this case, particularly since Van Dam already shared concerns with the Defendants and disproved of their lack of action in response. Furthermore, Town Councilman Whitworth confirmed her investigation and conduct at issue was outside the scope of her job, particularly the Attorney General's Office. (*See* ECF No. 44-14 at 4.) Ultimately, while admittedly a close call, the Court finds that once Van Dam's reporting was directed outside her chain of command, her speech transcended the bounds beyond her official duties. *See e.g. Howell v. Town of Ball*, 827 F.3d 515, 523-24 (5th Cir. 2016) ("Accordingly, we decline to infer solely from a Louisiana law enforcement officer's non-specific duty to 'detect and prevent crime' that Howell, as a local police officer, had an ordinary duty to participate secretly in an FBI investigation of coworkers' and superiors' illegal conduct.").

Turning to the second element, the Court finds Van Dam's speech did involve a matter of public concern. *See Trant*, 754 F.3d at 1165. "Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241

(quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotations and citations omitted)). Van Dam's investigation and conduct certainly did concern the community, as she alleged several in Town leadership and other Town positions were engaging in unlawful and deceitful conduct. Van Dam's email to Tina Trimble with DCI accused several Town of Guernsey employees of using, selling, and transporting drugs. (*See* ECF No. 37-4 at 3-4.)   Van Dam also shared some of her information and concerns with a member of the public, Karina Lewis, who had voiced concerns similar to that of Van Dam. (*See* ECF No. 42 at 2-4.) Van Dam's speech did not concern her own working conditions or involve a personal dispute or grievance she had with a senior administrative officer. *See Morris v. City of Colorado Springs*, 666 F.3d 654, 662 (10th Cir. 2012) (The plaintiff's complaint arose "out of *her own* working conditions. That is, 'what [was] actually said' in her allegations concerned essentially a 'personal dispute or grievance.") (quoting *Leverington v. City of Colorado Springs*, 643 F.3d 719, 727 (10th Cir. 2011)). Nor was her speech limited to grievances about internal department affairs or general workplace frustration. To the contrary, Van Dam's speech involved grievances the public would likely take interest in, as she alleged corruption, impropriety, and criminal malfeasance on the part of Town employees. *See Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1232, 1331 (10th Cir. 2007) ("As we have held many times, speech reporting the illicit or improper activities of a government entity or its agents is obviously a matter of great public import."). Regardless of the merit behind Van Dam's allegations, there is no evidence before the Court to suggest the Town ever assigned Van Dam the responsibility to report

outside the chain of command to Wyoming's Attorney General's Office, DCI, or the FBI. *See id*. at 1332.

The third factor of the *Garcetti/Pickering* tests requires the Court to determine whether the government's interests, as an employer, in promoting the efficiency of the public service outweighs the plaintiff's free speech interests. *See Trant*, 754 F.3d at 1165. In Van Dam's case, it does not. "The only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.'" *Id*. at 1166 (quoting *Brammer-Hoelter*, 492 F.3d at 1207). In this case, Van Dam continued to maintain her position as chief of police while she reported concerns to outside agencies up until her termination. There is no indication her performance was impeded as a result of her investigation, other than the Defendants' claims that she could not maintain the budget. (*See* ECF No. 37 at 20 ("the Defendants have explained that the neutral reason for her termination was based upon her failure to maintain and balance the police department's budget.")). Defendants do not connect Van Dam's budgetary failures to her investigation and reporting to outside agencies. Accordingly, the Court finds Van Dam's free speech interests are not outweighed by the government's interests in promoting the efficiency of public service.

The fourth and fifth elements are highly contested by the parties. The fourth element asks whether the protected speech was a motivating factor in the adverse employment action, and the fifth element inquires as to whether the terminating party would have reached the same decision in the absence of the protected conduct. *See Trant*, 754 F.3d at

1165. Defendants explain they terminated Van Dam for a "neutral reason"—that is, her failure to maintain the budget. (*See* ECF No. 37 at 20, *see also* ECF No. 37-5 at 4.) Mayor Paustian notes in Van Dam's termination letter, though, she was terminated for poor performance, insubordination, and disregard for the Town's interests. (*See* ECF No. 44-20.) These reasons do not necessarily align with the Town Council's discussion during executive session. (*See* ECF No. 45) Van Dam alleges that she was terminated "for her activities in lawfully enforcing the law and having private conversations." (ECF No. 42 at 24.) Similarly, while Defendants do not explicitly state Van Dam would have been terminated regardless of her investigation and reporting to outside agencies, it can be inferred from the pleadings, particularly where Defendants assert, "[t]here is no evidence that the mayor or council as a whole terminated her for her wild allegations against one councilman." (*See* ECF No. 37 at 11.)  Van Dam, on the other hand, highlights how the Defendants were pleased with her police work up until she began her investigation and discussions with other citizens. (*See* ECF No. 42 at 20.) There are genuine issues of material fact as to both the fourth and fifth elements under the *Garcetti/Pickering test*, precluding this Court from granting summary judgment. *See Brammer-Hoelter*, 492 F.3d at 1208, 1212; see also *Thomas v. City of Blanchard*, 548 F.3d 1317, 1328 (10th Cir. 2008).

While not specifically asserted in Van Dam's Complaint or briefings, Van Dam raised at the April 27, 2021 hearing an additional claim that the Defendants also violated her First Amendment right to speech in terminating her for communications they perceived Van Dam had with Karina Lewis, a concerned community member. (*See* ECF No. 1 at 5; *see also* ECF No. 42 at 2-4.) Although her communication with Lewis was limited, Van

Dam alleges Defendants perceived her to have provided Lewis information regarding policy decisions the Town was making, which Lewis eventually shared to social media. (ECF No. 42 at 2-4, 20.) During the January 14, 2020 executive session, Defendant Paustian, in reference to a Facebook post referred to "some leakage coming out of this town and he doesn't know where its coming from." (ECF No. 45). In addition, at some point in time, Defendant Augustyn requested and gained access to Van Dam's email account in an effort to identify a connection between Van Dam and Carina Lewis. (ECF No. 44-8 at 7-8; ECF No. 44-14 at 3; ECF No. 44-13 at 4, 6). Van Dam argued, even if her conduct and speech with Lewis did not involve Town policies, the Defendants mistakenly believed Van Dam was speaking to Lewis on matters implicating the Town. She argues, in light of *Heffernan v. City of Paterson, N.J.*, 136 S.Ct 1412 (2016), the Defendants' "perceived exercise" of Van Dam's free speech to Lewis also led to her termination, in violation of her First Amendment rights.

Applying the *Garcetti/Pickering* test to this category of perceived protected speech renders the same result as the email communications to outside law enforcement agencies. Van Dam engaged in this perceived conduct as a private citizen on a matter of public concern, strengthened by the fact that this speech was perceived to be directed to a private citizen, not another law enforcement agency. The communications were alleged to involve matters of Town policy and the public concern element is especially evidenced by the communication being between Van Dam and a member of the public who expressed issues with the Town's actions. Again, there is no indication such perceived communications disrupted Van Dam's ability to operate as the chief of police, so the government's interest

does not outweigh Van Dam's protected speech interests. Finally, as set forth above the fourth and fifth factors present disputed issues of material fact for a jury to decide. Ultimately, the Court finds Van Dam has raised a genuine dispute as to whether she was terminated for her perceived protected speech to Guernsey citizen Karina Lewis, so this First Amendment retaliation claim also withstands summary judgment.

### b.  Qualified Immunity Prong Two: Plaintiff presents evidence indicating Defendants violated "clearly established law".

The remaining question under qualified immunity is whether the Defendants violated "clearly established law" by terminating Van Dam. *See Knopf*, 884 F.3d at 994. For a right to be "clearly established," the focus turns on whether, at the time of the incident, "every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations omitted). A reasonable official understands what he is doing if "courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008). "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017). To meet this burden, "existing precedent must have placed the statutory or constitutional question beyond debate." *Knopf*, 884 F.3d at 994 (internal citations omitted).

Van Dam points to several Tenth Circuit cases to support her position that the Defendants violated "clearly established" law when they terminated her for reporting suspected criminal activity to outside agencies. (*See* ECF No. 42 at 11.) The Defendants contest Van Dam's position, simply arguing they are "not aware of any case law that would put the Defendants on notice that based on the sum total of the allegations they were doing anything incorrectly." (ECF No. 37 at 15.) Not all of the cases Van Dam relies on for clearly established law are persuasive. One case in particular—*Lighton v. Univerisity of Utah*, 209 F.3d 1213 (10th Cir. 2000)—was decided before the *Garcetti/Pickering* test was fleshed out in 2006, which the Tenth Circuit has held is essential to providing guidance on the clearly established law prong.[3] *See Knopf*, 884 F.3d at 947. Another case Van Dam cites—*West v. New Mexico Taxation and Revenue Dept.*, 757 F.Supp.2d 1065 (D.N.M. 2010)—simply stands for the proposition that, "in some circumstances, filing a complaint 'with an agency outside [a plaintiff's] direct chain of command" is considered speech of a private citizen. *See id*. While *West* correctly cites a rule, the Tenth Circuit determined West could not establish a Fist Amendment violation, so it does not present clearly established law to the particulars of this case. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008); *see also Knopf*, 884 F.3d at 994 ("existing precedent must have placed the *statutory* or *constitutional* question beyond debate.") (emphasis added).

---

[3] The analysis in *Lighton*, even if considered by the Court, does not present clearly established law for the particulars of this case. The court does not determine whether Lighton's speech was articulated as a private citizen, nor does the court find Lighton's speech was a matter of public concern. The court ultimately finds Lighton's speech was *unprotected* because of its personal nature, so *Lighton* does not present "clearly established law" to indicate Van Dam's termination was unconstitutional. *See* 209 F.3d at 1224-25.

Van Dam also cites to *Thomas v. City of Blanchard*, 548 F.3d 1317 (10th Cir. 2008) and *Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1232, 1331 (10th Cir. 2007), as references for clearly established law. (ECF No. 42 at 11.) The *Thomas* case contains a brief discussion on the matter of clearly established law, citing to an excerpt from *Casey* which states, "[i]t has been long established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action." *See Thomas*, 548 F.3d at 1328 (quoting *Casey*, 473 F.3d at 1333-34). A review of *Casey* finds the court's discussion on the matter was properly summarized in *Thomas*, and the court ultimately found Casey's reports to the New Mexico Attorney General remained legally viable against qualified immunity. *Casey*, 473 F.3d at 1334.

The Court finds *Casey* and *Thomas* to be persuasive examples of clearly established law, particularly since both cases involved a public employee speaking to an investigative agency outside the chain of their command. In *Casey*, the plaintiff was a Superintendent of a school district who discovered a problem with income discrepancies in a federally funded low-income program. *See Casey*, 473 F.3d at 1325-26. Casey reported these concerns, along with others involving the state's Open Meetings Act and district operations she believed violated state and federal law, to the School Board and its federal supervisory offices. *Id*. at 1326. The School Board largely dismissed Casey's concerns, so she filed a written complaint with the New Mexico Attorney General's Office. *Id*. The Tenth Circuit distinguished Casey's statements to the School Board and its supervisory federal authority from those directed to the New Mexico Attorney General since "Ms. Casey was not seeking

to fulfill her responsibility of advising the Board when she went to the Attorney General's Office." *See id.* at 1332. A similar concept applies here, Van Dam was not seeking to fulfill her responsibility as chief of police when she reported conduct to the Wyoming Attorney General's Office, DCI, and the FBI—rather, she was trying to report what she believed was corruption within Town leadership.

In *Thomas*, a similar situation occurred when the plaintiff, a building code inspector, reported suspected illegal activity relating to a falsely completed building certificate to the Oklahoma State Bureau of Investigation. *See Thomas*, 548 F.3d at 1320-22. The Tenth Circuit in *Thomas* relied on its decision in *Casey*, reiterating, "it was when Casey went beyond her supervisors and reported to someone outside her chain of command about a matter which was not committed to her care that we found that her speech was protected by the First Amendment." *See id.* at 1324. The court determined Thomas' decision to report outside his chain of command, instead of to his supervisors or the state housing inspector, was sufficient to find he was not acting pursuant to his official duties. *Id.* at 1325. Ultimately, the court held Thomas reporting was constitutionally protected speech. *Id.* at 1326.

The Court recognizes the difficulty of comparing a non-law enforcement official to a law enforcement official in the context of reporting suspected illegal activity to outside agencies. However, the record before the Court establishes Van Dam was acting outside the scope of her position as chief of police, particularly when she reported to the Attorney General and DCI. (*See* ECF No. 44-14 at 4.) Van Dam's reporting to agencies outside her chain of command is not speech which would have been "commissioned by [her]

employer." *See Garcetti*, 547 U.S. at 421-22. On the record before the Court, Van Dam has

established her reporting to the Wyoming Attorney General's Office, DCI, and the FBI was

outside the scope of her duties as a law enforcement officer.[4] This speech is clearly

established as protected under the First Amendment.

      Such a finding is consistent with the purpose of First Amendment speech protection

held by public employees in the workplace. The Supreme Court in *Lane* reiterated the

holding in *Garcetti*, explaining

> The mere fact that a citizen's speech concerns information acquired by virtue
> of his public employment does not transform that speech into employee—
> rather than citizen—speech. The critical question under *Garcetti* is whether
> the speech at issue is itself ordinarily within the scope of an employee's
> duties, not whether it merely concerns those duties.
>
> It bears emphasis that our precedents dating back to *Pickering* have
> recognized that speech by public employees on subject matter related to their
> employment holds special value precisely because those employees gain
> knowledge of matters of public concern through their employment.
>
>    . . .
>
> The importance of public employee speech is especially evident in the
> context of this case: *a public corruption scandal*. . . . It would be antithetical
> to our jurisprudence to conclude that the very kind of speech necessary to
> prosecute corruption by public officials—speech by public employees
> regarding information learned through their employment—may never form
> the basis for a First Amendment retaliation claim. Such a rule would place
> public employees who witness corruption in an impossible position, torn
> between the obligation to testify truthfully and the desire to avoid retaliation
> and keep their jobs.

*Lane v. Franks*, 573 U.S. 228, 240 (2014) (emphasis added). This importance was also

recognized in in *Conaway v. Smith*, where the Tenth Circuit recognizes

---

[4] Our decision on this point appropriately concerns only the record before the Court on summary judgment.
Defendants are free to establish at trial it was within the scope of Van Dam's duties as chief of police with the GPD
to report the suspected criminal conduct and corruption to the outside agencies. *See Casey*, 473 F.3d at 1333 n. 11.

the vital interest the public has in the integrity of those who administrate their government. It would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption.

853 F.2d 789, 798 (10th Cir. 1988) (internal citations omitted). The same interest applies here, particularly where a law enforcement officer suspects government corruption or wrongdoing arising to the level of criminal activity. Refusing to protect reporting such conduct to agencies outside the chain of command would create a chilling effect, effectively destroying First Amendment protections for law enforcement officers who suspect inappropriate conduct that is not properly dealt with internally. *See, e.g., Howell*, 827 F.3d 515, *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389 (4th Cir. 2015).

Van Dam has presented clearly established law pursuant to which the Defendants (the Town, Augustyn and Paustian) should have known terminating Van Dam for reporting illicit and possibly criminal conduct outside her chain of command or perceived communication to Ms. Lewis would have violated her constitutional rights. Accordingly, she has overcome Defendants' qualified immunity defense.

## 2. Plaintiff Has Not Established a Property Interest, But She Has Raised Genuine Dispute as to Her Liberty Interest Deprivation.

In addition to Van Dam's First Amendment claims, she claims she was terminated without due process of law, alleging her property and liberty interests in her employment and continued ability to work were violated. (*See* ECF No. 1 at 8-12; *see also* ECF No. 42 at 12-22.)

"The Fourteenth Amendment's Procedural Due Process Clause 'ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision.'" *Alcorn v. La Barge, WY*, 784 F. App'x 614, 618 (10th Cir. 2019) (unpublished) (quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)).

> "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process."

*Brammer-Hoelter*, 492 F.3d at 1209 (quoting *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004)). Due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961). Van Dam alleges her due process rights were violated by Defendants when she was terminated without notice or an opportunity to be heard. (ECF No. 1 at 11.) She also alleges her due process rights were violated when the Town made false accusations against her during her termination. (*Id.* at 12.) Van Dam alleges she holds a property interest in her continued employment and a liberty interest in her continued ability to work in her chosen profession of law enforcement. (*Id.* at 9, 11.) The Defendants argue Van Dam was terminated as an at-will employee and, therefore, possessed no property interest in her employment. (ECF No. 37 at 17.) Defendants also argue Van Dam has failed to establish a liberty interest in her good name and reputation. (*Id.* at 18-20.)

### a. Plaintiff Has No Possessory Interest in Her Continued Employment.

The Court will first address Van Dam's alleged property interest in her continued employment. "A property interest in continued public employment is not created by the Constitution." *Kingsford v. Salt Lake City School Dist.*, 247 F.3d 1123, 1128 (10th Cir. 2001) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Instead, a property interest in public employment stems from state law or some other independent source. *Id*. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

In Wyoming, employment is considered at-will, meaning an individual may be terminated for any reason or no reason at all, "unless an express or implied contract establishes employment that may only be terminated for cause." *Anderson v. South Lincoln Special Cemetery Dist. By & through Bd. of Trustees*, 972 P.2d 136, 139 (Wyo. 1999). Employees at-will have no legitimate claims of entitlement in continued employment, precluding any finding of due process violations. *Id*. at 141; *see Bear v. Volunteers of Am., Wyo., Inc.*, 964 P.2d 1245, 1255 (Wyo. 1998) ("Property interests may be created by statute or by contract. An individual may have a protected property interest in public employment if his contract entitles him to have continued employment in the absence of sufficient cause for discharge.") (internal citations omitted). The Wyoming Supreme Court has determined an implied in fact contract of employment can arise when an employee handbook provided terms consistent with such contract. *See Abell v. Dewey*, 970 P.2d 363, 371-72 (Wyo. 1994). However, the court cautioned, the existence of a handbook or employer's manual

does not always make employment for cause in every instance, and "each case must be considered on its own merits." *Id*. at 371 (citing *Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, 706-07 (Wyo. 1985)).

The parties agree Van Dam's employment status—whether at-will or for cause—is governed by contract law principles. (*See* ECF No. 37 at 16-18, ECF No. 42 at 12-14.) The parties dispute *which* document governs Van Dam's employment status, as there are two conflicting sources which apparently address the issue. (*See* ECF No. 37-1, ECF No. 44-11.) The Defendants point to the Town of Guernsey's Policies and Procedures manual ("the manual") which was dated July 7, 2015 and acknowledged and signed by Van Dam in August of 2015. (*See* ECF No. 37-1 at 2.) This manual includes an "At-Will Employment Statement" signed by Van Dam presumably the same day she signed the manual acknowledgment, which states

> Your employment with the Town of Guernsey is a voluntary one and is subject to termination by you or the Town of Guernsey at will, with or without cause, and with or without notice, at any time. Nothing in these policies shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of Town of Guernsey employees.
>
> This policy of employment-at-will may not be modified by any officer or employee and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the Town of Guernsey, whichever is applicable.
>
> These personnel policies are not intended to be a contract of employment or a legal document.

(*Id*. at 3.) This same manual includes an additional provision titled "Termination, Resignation and Discharge" which reads

> Unless expressly prescribed by statute or contract, employment with the Town of Guernsey is on an "at will" basis and may be terminated with or without cause or notice. Similarly, employees are free to resign them employment at any time. If at any time it is necessary for an employee to resign his or her employment with the Town, the Town of Guernsey requests at least two weeks' notice.

(*Id*. at 18.)

Van Dam asserts she was provided a GPD "handbook" but it is titled "Guernsey Police Department Standard Operating Guidelines" (ECF 44-11) (hereinafter "Guidelines") at the same time[5] she was provided the manual. Van Dam alleges the GPD Guidelines "clearly and unambiguously creates an expectation of continued employment." (ECF No. 42 at 13; *see also* ECF No. 44-2 at 1.) She argues the Guidelines were adopted in 2007 by the Town council. (*See* ECF No. 44-16, -17.) However, there is no admissible evidence to establish these Guidelines were in fact the Guidelines adopted by the Town council in 2007. The Guidelines she references include an "effective date" of December 1, 2012 but contain no signature of acknowledgment. (ECF No. 44-11 at 2.) The Guidelines contain a clause concerning "Termination and Reemployment" which provides, "After the probationary period, an officer will be subject to dismissal only for cause."[6] (*Id*. at 14). Van Dam argues this clause, combined with the Town's "official but unwritten policies"

---

[5] The timing of Van Dam's receipt of the handbook is unclear from the briefings. The response brief indicates Van Dam received a copy of the GPD "at the time" she signed the acknowledgment in the Town manual. (ECF No. 42 at 13.) However, this statement references Van Dam's affidavit, where she indicates she was provided the GPD handbook when she was hired. (ECF No. 44-2 at 1.)

[6] The GPD handbook Van Dam alleges to signify a departure in her employment status from at-will to for cause, also apparently includes a statement indicating probationary and non-probationary employees remain at will (*See* ECF No. 1 at 9.) Notably, Van Dam only discusses this portion of the handbook in a footnote in her Complaint and does not attach the relevant portions of the handbook. It appears from the table of contents provided in the excerpted portion of the handbook that the relevant language came from Chapter 4: Personnel, in Section C, titled "Probation for New Hires." (*See* ECF No. 44-11 at 1.)

that employees will enjoy a progressive disciplinary policy, creates a property interest in her continued employment. (ECF No. 42 at 13.)

This Court is unpersuaded by Van Dam's position, ultimately finding the handbook does not supersede the signed disclaimer signifying at-will employment in the Town Policies and Procedures manual. In addition, this Court would adopt the findings and conclusion reached by Judge Freudenthal in this companion case, *Clevenger v. Town of Guernsey*, 20-CV-062 (D.Wyo. April 16, 2021), in which she found Ms. Clevenger's employment at-will, despite these very documents. Aside from this, Van Dam has presented no foundation to establish the authenticity or admissibility of the purportedly applicable GPD Guidelines. Similarly, she has not presented sufficient evidence to verify that the GPD Guidelines attached to her response "adopted" by the Town. For her part, Van Dam presents meeting minutes from a Town Council meeting from July of 2007 where it is noted "CM Brown moved, second by CM Kelley approved the final revision of the Police Department Manual. Motion carried (3-0)." (ECF No. 44-16.) Van Dam also attached an affidavit from Joseph Michaels, Mayor pro-tem for the Town at the time of the July 2007 meeting, wherein Michaels asserts, "I recall that the Police Department Manual was approved by the Town Counsel on July 17, 2007" and "To the best of my knowledge the Police Department Manual contained for-cause termination status for officers, and it was the intent of the council that this status also applied to the Town's chief of police." (ECF No. 44-17.) Even if these statements are true, there is no evidence that the "Guernsey Police Department Standard Operating Guidelines" attached to Van Dam's response are the *same* guidelines purportedly adopted by the Town in July of 2007. Accordingly, Van

Dam fails to show this handbook was at all applicable during her time as chief of police in 2019 and into 2020.

Separate and apart from Van Dam's evidentiary shortfalls, even if the Court were to consider the handbook contained any sort of evidentiary value, it does not modify Van Dam's employment status from at-will to for cause. The Town manual Van Dam signed on August 30, 2015 includes a provision stating "This policy of employment-at-will may not be modified by any officer or employee and *shall not be modified in any publication or document*. The only exception to this policy is a written employment agreement approved at the discretion of the Town of Guernsey, whichever is applicable." (ECF No. 37-1 at 2) (emphasis added). Van Dam signed the document on the same page, directly below this statement. By the terms of the Town manual, no publication or document—including an employee handbook—shall modify the employment at-will policy. Van Dam has not presented a written employment agreement, the only exception to this rule against modification.[7]

Van Dam signed an express disclaimer acknowledging her employment was at-will in August of 2015. The language of the statement is unambiguous and definitively signifies Van Dam is an at-will employee. Any subsequent conduct indicating "official but unwritten policies" (ECF No. 42 at 13) of progressive disciplinary policies do nothing to change Van Dam's employment status. *See Trabing v. Kinko's, Inc.*, 57 P.3d 1248, 1254 (Wyo. 2002); *see also Worley v. Wyoming Bottling Co., Inc.*, 1 P.3d 615, 621 (Wyo. 2000) ("A valid,

---

[7] An additional impediment to Van Dam's claim in this case is that fact as Chief of Police, "unless otherwise provided by ordinance, . . . police chief, . . . shall be appointed by the mayor with the consent of the governing body and may be removed by the mayor. Wyo. Stat. § 15-3-204(a). No such ordinance has been identified.

conspicuous, and unambiguous disclaimer notifying employees of their at-will employment status can preclude a progressive discipline policy from forming an implied contract."). No genuine issues of material fact exist and, as a matter of law Defendants are entitled to judgment in their favor on Plaintiff's due process property claims.

### b. Plaintiff Has Established a Genuine Dispute as to the Deprivation of Her Liberty Interest in Good Name and Reputation.

To demonstrate a deprivation of liberty under these circumstances, a plaintiff must satisfy a four-part test: "First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published." *Renaud v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) (quoting *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994)). All four elements must be satisfied to demonstrate deprivation of the liberty interest. *Ellison v. Roosevelt County Bd. of County Comm'rs*, 700 Fed. Appx. 823, 830 (10th Cir. 2017). A statement is "published" if it is "made public." *Bishop v. Wood*, 426 U.S. 341, 348 (1976). The Tenth Circuit has held that "intragovernment dissemination, by itself, falls short of the Supreme Court's notion of publication" because such statements are not 'made public.'" *Asbill v. Hous. Auth. of the Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984). In this case the court finds Van Dam has demonstrated a genuine dispute of material fact as to her liberty interest deprivation "in her continued ability to work in her chosen profession of law enforcement." (*See* ECF No. 1 at 11.)

Van Dam alleges in her complaint that the Defendants' attack on her good name, reputation, honor, and integrity is particularly detrimental as a law enforcement officer. (*Id.*) She argues she was "entitled to and denied an opportunity to address those accusations and clear her name." (*Id.*) Defendants argue Van Dam fails to meet the Tenth Circuit test to state a claim for deprivation of liberty interest in good name and reputation. (*See* ECF No. 37 at 18-19.) In response, Van Dam points to the allegations published in her personnel file and spread to others, including a prospective employer (ECF 44-19), were sufficiently stigmatizing to deprive her of her liberty interest. (ECF No. 42 at 18.)

Van Dam highlights several instances which she alleges amount to "publication" of false statements, including a "change in status" form submitted to Van Dam's certifying agency, Peace Officer Standards and Training ("POST"), statements contained in Van Dam's personnel file, statements made to a DCI interim director, statements made during a meeting with GPD Officer Holt, on-the record interviews to a reporter for an undisclosed "national publication" regarding Van Dam's termination, and statements made to a prospective employer of Van Dam. (*See* ECF No. 42 at 18-21.) While Van Dam has failed to allege most of these statements were published, she does satisfy the *Workman* test as to one of the statements.

The Tenth Circuit has held that a town's communications to POST are considered intra-governmental communications and are to be considered statements in and of themselves as published for purposes of a liberty interest analysis. *See Alcorn v. Lar Barge, WY*, 784 Fed. Appx. 614, 619-20 (10th Cir. 2019). Therefore, the change in Van Dam's personnel file which would have been communicated to POST are not public statements

under the Fourteenth Amendment. The same analysis applies to any communications with persons at DCI and GPD Officer Holt, since both persons were with intra-governmental or state agencies. *See id*. at 619. ("[W]e see no meaningful distinction between applying the "intra-governmental dissemination" standard to communications across units of government . . . and between a state and its sub-units . . . . Indeed, important overlapping interests often exist between municipalities and state agencies."). *See also Clevenger v. Town of Guernsey*, 20-CV-062 at 14-15 (D.Wyo. April 16, 2021) (holding statements to POST, as well as any statements made to Town officials or employees represent intra-governmental dissemination and fail to satisfy requirement for "published"). Furthermore, Van Dam has not alleged any statements or changes in status sent to POST were ever made. *See id*. at 620.

Van Dam does not provide any details as to the alleged information provided to the "national publication" which would satisfy the four-part test. She does not assert what information was provided to the publication or allege any facts indicating the information was ever published. This allegation supports no claim.

Turning to the termination letter placed in Van Dam's personnel file, Van Dam alleges the letter was "published" to her personnel file, "which Defendants admit is subject to public disclosure." (ECF No. 42 at 19.) The Tenth Circuit has suggested some intra-governmental dissemination could constitute publication if information in an employee's personnel file is not restricted for internal use only. *See Bailey v. Kirk*, 777 F.2d 567, at 580 n. 18 (10th Cir. 2004). Here, Van Dam alleges the following statement is stigmatizing:

> Your employment with the Town is terminated in accordance with Wyo. Stat.
> § 27-3-102, in pertinent part:
>
> (xxiv) "Misconduct connected with work" means an act of an employee
> which indicates an intentional disregard of the employer's interest or the
> commonly accepted duties, obligations and responsibilities of an employee.
> . [.]
>
> The termination of your employment is based upon poor performance of your
> duties as Chief of Police for the Town of Guernsey; specifically, repeated
> acts of insubordination, failure to follow specific directives and unreasonable
> error in action and/or judgment in your capacity as Chief of Police.

(ECF No. 44-20 at 1; *see also* ECF No. 42 at 18-19.) This statement does not allege any

dishonesty or immorality, nor does it attack her character and integrity. Rather, it indicates

Van Dam's inability to perform her duties and follow authoritative directives, which she

could explain to future employers. *See Asbill v. Housing Authority of Choctaw Nation of

Oklahoma*, 726 F.2d 1499, 1503 (10th Cir. 1984).   Thus, Plaintiff has failed to present

genuine issues of material fact to support her claim based upon her termination letter.

Nonetheless, the Court finds Van Dam has presented a genuine dispute as to the

falsity of the statements allegedly made by Defendant Augustyn and Defendant Paustian

to a prospective employer, Dusty Bryner. (ECF No. 44-19). Van Dam attached an affidavit

from Bryner in which he noted he had received an application for employment from Van

Dam.   Thereafter, he was contacted by Augustyn and Paustian, who each made statements

reflecting poorly on Van Dam's integrity and character. (*See* ECF No. 44-19.) Augustyn

asserted Van Dam was a danger to the community because of her past conduct and external

reporting. (*Id*. at 2.) Paustian told Bryner that Van Dam was dishonest, had trouble telling

the truth, and created dissention within the town. (*Id*. at 3.) The statements were "made

public" by Augustyn and Paustian to Van Dam's prospective employer, Bryner, and they call into question the good name, reputation, and honor of Van Dam, satisfying *Workman*. *See* 32 F.3d at 481. The parties dispute the falsity of these statements. Accordingly, the Court finds genuine issues of material fact exists as to whether Van Dam's liberty interests were deprived by such a statement, so this claim withstands summary judgment.

**Claims for Injunctive and Declaratory Relief**

Plaintiff has failed to articulate any legal basis for injunctive relief. To the extent her rights were violated Plaintiff will have an adequate legal remedy to fully compensate her. Thus, no basis for injunctive relief exists. As to her claim for declaratory relief finding that her termination is void, the Court has found Plaintiff to be an at-will employee. Thus, she is not entitled to any declaratory relief.

## CONCLUSION

In accordance with the foregoing discussion, the Court finds genuine issues of material fact preclude Defendants Motion for Summary Judgment as to Plaintiff's §1983 claim based upon retaliatory termination in violation of her First Amendment right to free speech against Nick Paustian and Kellie Augustyn in their individual capacities and the Town of Guernsey, Claim I. In addition, the Court finds that genuine issues of material fact exist with respect to Plaintiff's §1983 claim based upon a violation of due process – liberty interest against Nick Paustian and Kellie Augustyn in their individual capacities, Claim III. The Court finds that no genuine issues of material fact exist, and that Defendants are entitled to a judgment in their favor on Plaintiff's remaining claims, II, IV, V and VI. The Court also finds that no genuine issues of material fact exist and Defendant Kate

Farmer, in her individual and official capacity, is entitled to judgment in her favor as to all claims for relief. Finally, Defendants Mayor Paustian and Councilman Augustyn, in their official capacities, are entitled to judgment in their favor. Therefore, it is

ORDERED that Defendants' *Motion for Summary Judgment* (ECF No. 36) is hereby GRANTED as to Plaintiff's claims II, IV, V, and VI, and all claims against Kate Farmer in her individual and official capacities, and Mayor Paustian and Councilman Augustyn in their official capacities. It is further

ORDERED that Defendants' Motion for Summary Judgement (ECF No. 36) is DENIED as to Plaintiff's §1983 claim based upon retaliatory termination in violation of her First Amendment right to free speech against Nick Paustian and Kellie Augustyn in their individual capacities and the Town of Guernsey, Claim I, and Plaintiff's §1983 claim based upon a violation of due process – liberty interest against Nick Paustian and Kellie Augustyn in their individual capacities, Claim III.

Dated this _____ day of May, 2021.

Scott W. Skavdahl
United States District Judge